# EXHIBIT 2

VERNON C. GOINS II (SBN 195461)
vgoins@goinslawfirm.com
WILLIAM W. CASTILLO GUARDADO (SBN 294159)
wcastillo@goinslawfirm.com
LAW OFFICES OF VERNON C. GOINS
1970 Broadway, Suite 450
Oakland, CA 94612
Telephone:    (510) 663-3700
Facsimile:    (510) 663-3710

PAMELA M. KEITH (D.C. Bar No. 448421)
PamKeith@CenterforEmploymentJustice.onmicrosoft.com
CENTER FOR EMPLOYMENT JUSTICE
650 Massachusetts Ave. NW
Suite 600
Washington, DC 20001
Telephone:    (202) 800-0292
Facsimile:    (202) 807-5725
*Pro Hac Vice*

Attorneys for Plaintiff
ANTOINETTE DICKENS

Law Offices of Vernon C. Goins
1970 Broadway, Suite 450, Oakland, California 94612
Tel. (510) 663-3700; Fax (510) 663-3710

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

| | |
|---|---|
| ANTOINETTE DICKENS | Case No.: 5:23-CV-01073-BLF |
| *Plaintiff,* | **FIRST AMENDED COMPLAINT** |
| v. | **DEMAND FOR JURY TRIAL** |
| NXP SEMICONDUCTORS, | VIOLATION OF 42 U.S.C. §2000 (e) et seq., Hostile Work Environment, Disparate Treatment, Failure to Promote, Disparate Pay and Retaliation Based on Race and Gender |
| *Defendant.* | |

FIRST AMENDED COMPLAINT ("FAC")
*Antoinette Dickens v. NXP Semiconductors*
USDC-NDCA Case No. 5:23-CV-01073-BLF
- 1 -

Law Offices of Vernon C. Goins
1970 Broadway, Suite 450, Oakland, California 94612
Tel 1 (510) 663-3700; Fax (510) 663-3710

## FIRST AMENDED COMPLAINT

1
2      Comes now Plaintiff, *Antoinette Dickens* (hereinafter "Plaintiff" or "Ms. Dickens"), by
3  and through undersigned counsel with her Complaint for damages and injunctive and declaratory
4  relief, against her employer Defendant NXP Semiconductors (hereinafter "Defendant" or "NXP"),
5  for violation of Title VII of the Civil Rights Act of 1967, 42 U.S.C. § 2000(e) *et seq.*,  and states
6  as follows:

## PARTIES

8      1.      Defendant is a multi-national manufacturer of electronic components, registered in
9  the Netherlands, with wholly owned subsidiaries in the United States, Germany, Taiwan and
10 several other countries. Its manufacturing and design headquarters are in Austin, Texas. From 2010
11 to 2020, its CEO and leadership team resided in San Jose, CA. In 2020, its USA headquarters was
12 moved to Austin, TX.  Defendant is a globally integrated enterprise that leverages its many
13 subsidiaries to provide seamless services to its global customers, with senior management resident
14 in the United States, and U.S. law and policy dominating its corporate operations.

15     2.      In the United States, Defendant has several offices, including in San Jose, CA,
16 where the CEO resided until 2020, and Plaintiff's senior leadership team resides, and in
17 Washington, DC, where Defendant conducts business for the United States government.

18     3.      According to its website, Defendant's 2022 annual revenue was more than 13
19 billion dollars.

20     4.      Plaintiff is an African American woman who is a resident of the State of Illinois,
21 but currently resides and works for Defendant in its Hamburg, Germany office.  Due to
22 Defendant's actions, Plaintiff was forced to relinquish her employment and will be moving out of
23 Germany in matter of weeks.  Plaintiff reported to NXP managers in Germany, who in turn
24 reported to leaders in the United States, most of whom worked directly for the parent company,
25 NXP NV.  Plaintiff's work was substantially for United States entities.

26
27
28

Law Offices of Vernon C. Goins
1970 Broadway, Suite 450, Oakland, California 94612
Tel. (510) 663-3700, Fax (510) 663-3710

**JURISDICTION AND VENUE**

5.   This Court enjoys jurisdiction over this case because the claims arise under the laws of the United States.  Furthermore, there is diversity of citizenship between the Plaintiff and Defendant.

6.   Defendant is a singular integrated operation, with sufficient operations in the United States to warrant being subject to United States law.

7.   This Court enjoys personal jurisdiction over the Defendant under the minimum contacts doctrine of this Court.  Defendant maintains a headquarters at 411 East Plumeria Dr. San Jose, CA 95134.

8.   Plaintiff's claim "arose" in both Germany where she was harassed and discriminated against, and in California, where her senior management team refused to act on her internal EEO complaints, made the decision to deny her fair pay, and retaliated against her by involuntarily removing her from her team.  The relevant witnesses are located in both Germany and in United States.

**RELEVANT FACTS**

9.   Plaintiff is an African American woman, and as such is a member of two protected classes:  African American, and female.

10.   Plaintiff graduated from the National Academic Center of Excellence in Cybersecurity, with a Bachelors' Degree in Cybersecurity and Information Assurance, and also maintains fifteen professional certifications focused in and around cybersecurity and technology.

11.   Plaintiff is currently enrolled in a Master's Degree in Cyber Security program at New York University and is a cybersecurity expert who develops examination content for The International Information System Security Certification Consortium.

12.   Prior to being hired by Defendant, Plaintiff was employed by Northern Trust Bank for approximately eleven years as a security architect and had a cumulative experience of at least 15 years.

13.   In February of 2018, Plaintiff was hired by Defendant as a Security Manager, to work in the Competence Center Crypto and Security, in the Hamburg Office.

**Deleted:** As a company registered in Delaware, Defendant is subject to the laws of the United States, especially as they relate to citizens of the United States, and pursuant to Section 109 of the Civil Rights Act of 1991, the provisions of Title VII extend to American nationals working for American companies overseas.

**Deleted:** when

**Deleted:** . Most of

**Deleted:** records and

**Deleted:** or

**Deleted:** California

**Deleted:** <#>As an employee of Defendant, Plaintiff entered into a contractual relationship with Defendant and had the right to enjoy and enforce that contract.¶

**Deleted:** Masters'

**Deleted:** TBD

14.     She was hired to lead and spearhead many United States-based security projects. It was particularly emphasized that Plaintiff would be a good fit for working with personnel based in the United States. Plaintiff knows very little German and does not read the language at all.

15.     Due to the nature of her work, Plaintiff was assigned to deal with various international security certification bodies. However, decisions about resources and budgets were driven by United States based senior leadership in San Jose.

16.     On information and belief, NXP Semiconductors NV is the parent of wholly owned subsidiaries NXP USA and NXP Germany, as well as many others.

17.     On information and belief, the parent company, NXP NV has common ownership of NXP USA and NXP Germany, as well as many other subsidiaries.

18.     On information and belief, NXP NV has delegated corporate and employee relations policy to its wholly owned subsidiary, NXP USA.

19.     Plaintiff was originally hired by Christoph Herbst (hereinafter "Mr. Herbst"), who was to be her direct manager on the Site Certification Team. However, within six (6) months of her hiring, Mr. Herbst left the company and Plaintiff's new manager was Gordon Caffrey (hereinafter "Mr. Caffrey").

20.     Mr. Caffrey asked Plaintiff to take over the U.S. based work out of the Phoenix, AZ office, and was assigned a "security site" where the Phoenix local security team reported indirectly to her for close to four years.

21.     Like other lines of business of Defendant, the Cyber Security team of Defendant was a globally integrated operation, in which employees in Asia or Europe, would work directly for clients in the United States, and vice-versa.

22.     For example, NXP had approximately 125 sites in 2019. Of the 17 U.S. based cites (both NXP sites and third-party sites), Plaintiff worked on approximately eleven (11) of them as part of her normal day-to-day duties. For several years, and when working on U.S. projects, Plaintiff was expected to attend staff meetings no differently than U.S. based personnel.

Law Offices of Vernon C. Goins
1970 Broadway, Suite 450, Oakland, California 94612
Tel. (510) 663-3700, Fax (510) 663-3710

FIRST AMENDED COMPLAINT ("FAC")
*Antoinette Dickens v. NXP Semiconductors*
USDC-NDCA Case No. 5:23-CV-01073-BLF
- 4 -

**Deleted:** <#>Defendant is an American and Dutch company, with its headquarters in both San Jose, CA and Eindhoven, The Netherlands. ¶

**Deleted:** TBD

23. Plaintiff, in particular, was often used for projects in the United States because she was a United States citizen, and because of her unique understanding of U.S. culture and ability to relate to U.S. based clients.

24. Along with Mr. Caffrey, John Boggie (hereinafter "Mr. Boggie") became the management team that oversaw Plaintiff's day-to-day activities. Both Mr. Caffrey and Mr. Boggie are white males.

25. Importantly, all of Plaintiff's division reported to David Case, Head of Global Security, who is based in the United States. Thus, all of the important management decisions regarding Plaintiff's work and terms and conditions of employment were based out of the United States.

26. Plaintiff, as well as Mr. Caffrey and Mr. Boggie, reported to Mr. Case by way of Nick Meadows (hereinafter "Mr. Meadows") and Nick Elvrum (hereinafter "Mr. Elvrum"), both of whom were based in the United States. On information and belief, Mr. Case was the final decision maker on all matters related to hiring, assignment and termination of personnel in his division.

27. Every aspect of Plaintiff's employment was fully and globally integrated with operations in the United States.

28. In day-to-day operations, Defendant made no distinction between its subdivisions and entities, routinely and seamlessly placing people from offices in Asia on European projects, people in Europe on U.S. projects, and so forth.

29. The integrated structure of the entity was such that there was no need for employees like Plaintiff, resident in Europe, to be seconded or loaned to the NXP U.S.A. to work on American projects.

30. For example, Plaintiff worked on a project in Chandler, Arizona, Chicago, IL. The work on those projects were invoiced directly to NXP in Austin, TX, not to NXP in Germany where Plaintiff was resident.

Law Offices of Vernon C. Goins
1970 Broadway, Suite 450, Oakland, California 94612
Tel. (510) 663-3700; Fax (510) 663-3710

Deleted: TBD

31. Defendant markets itself to potential clients as one integrated enterprise as NXP. The distinction of corporate entities does not extend to its public facing representations. For example, all NXP employees have an email address of NXP.com, regardless of their location.

32. All NXP business is conducted in English, regardless of where the employees are resident.

33. NXP, in its global entity, is owned by shareholders who buy, hold and trade their ownership stake through stocks traded on the Nasdaq stock exchange, a United States based trading platform. Its Nasdaq trading symbol is (NXPI), and is currently trading at over $200 per share.

34. All NXP employees are subject to the same corporate policies, regardless of what country in which they are resident. NXP's various subsidiaries share resources, facilities, and personnel frequently.

35. Importantly, NXP's Chief Human Resources Officer, Chris Jensen is based in the United States, as is all of NXP's HR and Diversity and Inclusion leadership team.

36. All of the Global HR partners report to Mr. Jensen. Mr. Jensen reports directly to Mr. Sievers.

37. For all times relevant to the First Amended Complaint (hereinafter "FAC"), Mr. Sievers maintained an office in San Jose, California, per internal company communications, and Plaintiff was informed by her leadership team that he could be contacted there.

38. Mr. Siever's predecessor Mr. Clemmer, is a United States citizen who resided and worked out of the San Jose office from 2010-2020, and for substantial times relevant to the claims herein.

39. NXP's employee policies, including policies with respect to dealing with allegations of hostile work environment, harassment, discrimination and retaliation, are derived from the HR headquarters in Austin, and are based on United States law.

40. Plaintiff was the only person of color, and only African American woman on the Site Certification Team, as well as the only African American in the Hamburg office.

41. Early on in their working relationship, Plaintiff was singled out for disparate and unfair treatment, when Mr. Caffrey and Mr. Boggie took steps to evict her out of a single office in

Deleted: TBD

Law Offices of Vernon C. Goins
1970 Broadway, Suite 450, Oakland, California 94612
Tel (510) 663-3700; Fax (510) 663-3710

1  which she was working, while allowing others at her level, as well as persons below her level, to

2  have their own office.  This was the first sign of management's bias against Plaintiff.

3      42.    Also early on in her tenure, Plaintiff noted the palpable hostility towards her from

4  her colleagues, who were cold, distant, distrustful, envious, suspicious and bullying.

5      43.    For example, when Plaintiff first arrived in Hamburg, she shared an office with a

6  white male subordinate, who was a field engineer, who stood over six feet tall.

7      44.    In the middle of February, the engineer left open the office window, making the

8  workspace unbearably cold.  When Plaintiff closed the window while her office-mate was on a

9  job, the engineer became irate when he returned to the office, standing over her desk, encroaching

10  on her personal space, yelling at and essentially bullying Plaintiff, insisting that she never touch

11  the window again.  His reaction was outrageous and completely unexpected. The following day,

12  Plaintiff vacated the office.

13      45.    When Plaintiff explained to her colleagues why she vacated the office, indicating

14  that the reaction from the engineer made her afraid for her physical safety, her colleagues doubted

15  her, and questioned what she had done to offend the engineer.

16      46.    Plaintiff moved into an office with a white female engineer, Astrid Schweer

17  (hereinafter "Ms. Schweer"), whose first comment to Plaintiff when they were alone in the office

18  was: "Before you, there was a Jew here," and then scoffed in disgust.

19      47.    Plaintiff did report this incident to Mr. Boggie and Mr. Caffrey, expressing her

20  concerns about the bigotry and hostility of Ms. Schweer's comment, and Mr. Boggie tried to make

21  a joke of it by asserting that the previous occupant was a Korean man with a last name of "Ju."

22      48.    Plaintiff was never able to corroborate that such a person existed.  When Plaintiff

23  asked what was humorous about that, Mr. Boggie had no response.

24      49.    From that point forward, the non-verbal hostility towards Plaintiff escalated, and

25  she was further isolated and marginalized by her colleagues.  As a result, when a single office

26  became available, Plaintiff seized the opportunity to work alone.

27      50.    Two weeks later, Mr. Boggie warned Plaintiff that she wasn't "fitting into the

28  culture," and insisted that she would benefit from working in an office with someone.  This

Law Offices of Vernon C. Goins
1970 Broadway, Suite 450, Oakland, California 94612
Tel. (510) 663-3700; Fax (510) 663-3710

Deleted: TBD

1   assertion was subterfuge for trying to force Plaintiff out of the solo office because some of her

2   white colleagues had complained and were envious of Plaintiff.

3       51.   The solo office was then assigned to Thomas Billeau (hereinafter "Mr. Billeau"), a

4   white male who was a supervisor for a different team in the office.

5       52.   Notably, Mr. Billeau did not actually need the office, did not use it, and didn't move

6   his things into the office for two (2) years.  Essentially, the office was taken from Plaintiff to deny

7   her the benefit, and no other reason.  The space was principally used as a storage closet.

8       53.   Plaintiff was forced to move into an office with another person.  She was denied

9   the ability to work with a person of her choosing, and instead was placed in an office with a white

10  female employee who was a long-time administrative staffer.

11      54.   The move was scheduled and coordinated by Julia Lang (hereafter "Ms. Lang"), a

12  white female, who was the team assistant, responsible for arranging travel and carrying out

13  administrative tasks.

14      55.   However, it was clear that Ms. Lang was intentionally sloppy (at best) in the way

15  she dealt with Plaintiff, constantly subjecting Plaintiff to substantial errors in travel arrangements,

16  while being meticulous and correct about the arrangement for others.  The repeated mistakes on

17  Plaintiff's travel became a joke on the team.

18      56.   On the day of the office move, Plaintiff went to her office to finalize the move, and

19  realized that her things had not been moved to the new space.

20      57.   Two Information Technology (IT) staffers who were there, noted that Plaintiff's

21  computer equipment had not been moved for them to reconnect.  The two staffers, Hatim Dik

22  (hereinafter "Mr. Dik") and Secan Akbulut (hereinafter "Mr. Akbulut"), were witnesses to what

23  transpired thereafter.

24      58.   Ms. Lang came over to where Plaintiff, Mr. Dik and Mr. Akbulut were standing, at

25  which point Plaintiff asked Ms. Lang why her things had not been moved.  Ms. Lang, wanting to

26  shift attention away from her error, became very emotional and then walked away.

27      59.   Ms. Lang then reported to Matthias Wagner (hereinafter "Mr. Wagner"), a Director

28  in the CCC&S group, that Plaintiff had made Ms. Lang cry.  Buying completely into the racist

Deleted: coordinated

Deleted: TBD

FIRST AMENDED COMPLAINT ("FAC")
*Antoinette Dickens v. NXP Semiconductors*
USDC-NDCA Case No. 5:23-CV-01073-BLF
- 8 -

Law Offices of Vernon C. Goins
1970 Broadway, Suite 450, Oakland, California 94612
Tel. (510) 663-3700; Fax (510) 663-3710

Law Offices of Vernon C. Goins
1970 Broadway, Suite 450, Oakland, California 94612
Tel. (510) 663-3700; Fax (510) 663-3710

trope of the "angry Black woman," Mr. Wagner immediately believed Ms. Lang, without any evidence, and without speaking to the witnesses, marched into Plaintiff's office and began yelling at her, demanding she get off the phone.

60.    Rather than engage in any investigation whatsoever of what Ms. Lang alleged, Mr. Wagner attacked Plaintiff and accused her of inappropriate and hostile behavior towards Ms. Lang.

61.    Plaintiff pointed to Mr. Dik and Mr. Akbulut as witnesses who would establish that she did not raise her voice or act in any inappropriate way towards Ms. Lang, and simply questioned Ms. Lang about why the move had not taken place.

62.    The incident was reminiscent of many recent, well documented examples of white people falsely accusing Black people of doing something outrageous, in order to get them removed from somewhere they are entitled to be.

63.    On the following Sunday, at approximately 9pm, Mr. Wagner wrote to Plaintiff and demanded that they further discuss the incident that had occurred the week before.

64.    Plaintiff wrote to the manager of the two IT employees and asked if they could be made available to explain what they saw, and the manager agreed.  Plaintiff also included her own manager on the email, so that he would be aware of what was transpiring.

65.    On or about November 19, 2018, the two IT workers came to the meeting, but Mr. Wagner **_refused_** to hear to what they had to say, alleging that Plaintiff had "planted a seed" in their minds, despite the fact that Plaintiff had never met the two witnesses before, and did not work with them.  The witnesses worked in a completely different building.

66.    However, it is important to note that both witnesses were Turkish men, and obviously people of color.  Mr. Wagner, by way of his accusation, revealed his bias and prejudice against people of color, and a bigoted preconception that people of color would lie for each other.

67.    Mr. Dik and Mr. Akbulut waited outside of the meeting for an hour, listening to Mr. Wagner berate Plaintiff, while also accuse them of lacking integrity.

68.    From that point on, Mr. Wagner informed Plaintiff that he was going to pursue her, and do all in his ability to get her out because she was "not a good fit."  He demanded multiple

Deleted: TBD

Law Offices of Vernon C. Goins
1970 Broadway, Suite 450, Oakland, California 94612
Tel. (510) 663-3700; Fax (510) 663-3710

1  meetings and discussions about the incident, insisting that Plaintiff was making other people
2  uncomfortable.

3       69.    Again, it bears repeating that at the time, Plaintiff was the only African American
4  person on the team, or even working in the building.  Mr. Wagner was singling Plaintiff out as
5  making others uncomfortable, without ascertaining in any way whether Plaintiff had actually done
6  anything to create that discomfort.

7       70.    Mr. Wagner's harassment and incessant attacks on Plaintiff continued until at least
8  February of 2019, when performance appraisals were to be submitted.

9       71.    Although Mr. Wagner was not in Plaintiff's chain of command, and had no
10  responsibilities for supervising her in any way, he insisted on inserting his negative view of
11  Plaintiff into her review, which lowered her appraisal.

12       72.    The negative comment was based on somethings that had nothing to do with her
13  performance, and was never substantiated.

14       73.    At the time, Plaintiff's manager, Mr. Caffrey, indicated that he was uncomfortable
15  with Mr. Wagner's bias, and that he disagreed with the lower appraisal, but that there was nothing
16  he could do about it, stating he was also forced to write a negative review.

17       74.    As a result of the negative review, again, that had nothing to do with her work
18  performance, Plaintiff was placed on a performance improvement plan.

19       75.    Plaintiff became aware based on repeated rumors in the office, that Ms. Lang, who
20  was substantially younger than Mr. Wagner, was in a romantic relationship with him, however,
21  such rumors were never confirmed. However, Mr. Wagner confirmed to Mr. Caffrey that Ms. Lang
22  was a "personal friend" of his.

23       76.    As a result of Mr. Wagner's campaign against Plaintiff, she was placed on a
24  performance improvement plan, although none of the stated areas of improvement had anything
25  to do with her job performance.

26       77.    In order to try to improve the situation, Plaintiff agreed to engage in a mediation
27  with Ms. Lang, conducted by the Hamburg Human Resources staffer, Janin Kaske (hereinafter
28  "Ms. Kaske") on Jan 24, 2019, at the direction of HR leadership in Austin, TX.

Deleted: TBD

78.     Within a minute of the meeting starting, Ms. Lang broke into tears and began sobbing, which stymied any real conversation. The only thing Ms. Lang was able to say was that Plaintiff was "intimidating."

79.     When asked to elaborate, Ms. Lang could not explain anything, or give any example of what Plaintiff said or did to be "intimidating." The only logical conclusion that could be drawn from the situation was that it was Plaintiff's status as being an African American woman, that caused Ms. Lang's histrionics.

80.     After the meeting, Plaintiff and Ms. Lang ended up alone together waiting to take the elevator down to leave the building, at which time Ms. Lang apologized to Plaintiff that the whole thing had escalated, because Mr. Wagner had seen her crying and became irate. Ms. Lang stated then that she had not intended for the incident to escalate to that point, or words to that effect.

81.     Later on, Plaintiff was informed that Mr. Wagner had a reputation for being a "loose cannon," with an overly volatile personality, and that he had no direct reports because of his aggressive and inappropriate communication style.

82.     When it became clear that there was not merit to Mr. Wagner's complaints against Plaintiff, she was removed from the performance improvement plan. Instead, she was required to attend a mediation, and to "apologize" to her colleagues for reporting the anti-Semitic comment that was not taken seriously by management, and for closing the window in her first office to keep herself from freezing in her office.

83.     Importantly, Defendant clearly demonstrated a pattern of prioritizing the feelings and perspectives of its white employees, over that of Plaintiff, which carried forward during the duration of Plaintiff's employment.

84.     Thereafter, Plaintiff was frequently out of the office on work assignments, and was able to avoid some of the racist, inappropriate behavior of her colleagues.

85.     When the 2020 United States presidential election cycle began to intensify, Plaintiff started being harassed by her managers, Mr. Caffrey and Mr. Boggie, who tried to throw their love of Donald Trump in Plaintiff's face, and make her workplace a hostile environment for her.

**Deleted: TBD**

Law Offices of Vernon C. Goins
1970 Broadway, Suite 450, Oakland, California 94612
Tel. (510) 663-3700; Fax (510) 663-3710

Law Offices of Vernon C. Goins
1970 Broadway, Suite 450, Oakland, California 94612
Tel. (510) 663-3700; Fax (510) 663-3710

86.     It is no secret that Trump and his supporters often made racist comments, and that the MAGA hat is seen as a symbol of white supremacy, to most African Americans.  It is also no secret that more than 80% or African Americans disdain Donald Trump.

**Deleted:** .

87.     But in any event, Plaintiff did not discuss politics at her place of business, and did not invite her colleagues to discuss American politics with her.  So every time that Donald Trump was raised, it was so that Plaintiff's managers could shove their love of his racism in Plaintiff's face.

88.     Plaintiff was the only American in the office, and the only person who would be affected by the reelection of Donald Trump.

89.     Plaintiff's managers were not merely expressing their opinions, they were willfully taunting Plaintiff, bringing up the subject in team meetings and in other wholly inappropriate settings.

90.     It was a clear and intentional effort to make Plaintiff uncomfortable, to make her feel vulnerable and on the defensive, and to make her aware that her managers harbored white supremacist ideology.

91.     Plaintiff acidulously avoided conversations about politics in general, and American politics, in particular, with her colleagues.  She did not seek to represent the "American" viewpoint, and made concerted efforts not to extend conversation that were started by her colleagues.

92.     Importantly, not only did her colleague broach these topics to bully Plaintiff, but they demanded that she defend America, as if that was part of her job duties, which it was not.

**Deleted:** breach

93.     After recovering from having contracted COVID in March of 2020, Plaintiff returned to work in April of that year.

94.     Because COVID travel restrictions were in place, Plaintiff was asked to take on substantially more work to mitigate the increased load resulting from the inability to do site visits. Plaintiff was also asked to help with new projects that were not part of her regular duties.

95.     For example, four people on Plaintiff's team had the skills and capacities to do automotive cyber security work.  However, Plaintiff was the ***only person*** asked to take on this substantial collateral duty, which essentially doubled her workload.

**Deleted:** TBD

96.   In February 2020, Mr. Caffrey informed Plaintiff she was rejected for a promotion despite the additional work she completed the year prior since it was part of her "normal tasks" although others on the team were not expected to perform the same "normal tasks," such as ISO 27001 compliance.

97.   In April 2020, Mr. Caffrey specifically promised Plaintiff a promotion as an incentive to take on the huge volume of additional work.

98.   In July of 2020, Mr. Caffrey asked Plaintiff to go to a work site on a Sunday, without obtaining receiving pre-approval from HR or the worker's council, which is illegal in Germany.

99.   Plaintiff refused, because if she had done so without the proper approvals, she would have risked her work and residency permit.

100.   Mr. Caffrey became annoyed when Plaintiff declined the Sunday work until there was proper approval.  In doing so, Plaintiff made clear to Mr. Caffrey that she was willing to do the work, just not off the books or without approval.

101.   In August, during the Black Lives Matter protest period, Mr. Caffrey, without any prompting or invitation, began complaining to Plaintiff about the removal of statues of slave owners across the UK as a result of the BLM movement, as if Plaintiff had any control over that.

102.   Again, Mr. Caffrey went out of his way to express a racist opinion to an African American woman subordinate, with the intention of putting her on notice of his white supremacist attitudes, and to put her on the defensive.

103.   Mr. Caffrey had stated on multiple occasions that Trump was a "genius" and even purchased Plaintiff a Trump candy bar which he personally brought to her office after a trip to the US.  This gesture was a slap in the face to Plaintiff.

104.   In August of 2020, during a team conference call, Mr. Caffrey again raised his love of Donald Trump and started attacking Democrats.  However, because Plaintiff was the only American on the call, she was the only person Mr. Caffery could have been speaking about.

Law Offices of Vernon C. Goins
1970 Broadway, Suite 450, Oakland, California 94612
Tel. (510) 663-3700; Fax (510) 663-3710

Deleted: Feb

Deleted: TBD

Law Offices of Vernon C. Goins
1970 Broadway, Suite 450, Oakland, California 94612
Tel. (510) 663-3700; Fax (510) 663-3710

105.     It bears repeating that Plaintiff had never revealed her political affiliation to Mr. Caffrey or anybody else at work.  Several persons on the call attempted to change the subject, but were not successful.

106.     Thereafter, at every opportunity that Mr. Caffrey was in Plaintiff's presence, he broached the subject of his personal love of Donald Trump, knowing that Plaintiff never responded or participated, and was clearly uncomfortable.  Mr. Caffrey would express his white-supremacist position at every team call, which took place twice per week.  In doing so, Mr. Caffrey was creating a hostile work environment for Plaintiff.

107.     In October of 2020, Mr. Caffrey went on for ten minutes about his love of Donald Trump and the call for the neo-Nazis and the Proud Boys to stand back and stand by, which Mr. Caffrey wanted to discuss in detail.

108.     At that point, Plaintiff felt the need to specifically ask Mr. Caffrey to start the business meeting. Mr. Caffrey took umbrage, berated Plaintiff, and told her that she needed "relax and stop being so sensitive."

109.     Plaintiff told Mr. Caffrey that she did not find the conversation funny, and that he knew exactly why she didn't want to discuss the subject. Mr. Caffrey ignored Plaintiff and carried on with the inappropriate and racially harassing conversation.  Plaintiff then dropped off of the call.

110.     Immediately after the call, two of Plaintiff's female colleagues reached out to her to see if she was OK.  They also admitted that they felt extremely uncomfortable with the staff call, and they felt it was a concerted attack on Plaintiff.

111.     A few days later, Plaintiff reached out to Mr. Boggie because she needed to escalate a work issue related to part of her automotive cyber-security tasks.  Plaintiff ended up as the only woman on a call with eight men, trying to address the issue.

112.     During the call, Mr. Boggie suggested that the reason the issue was being escalated was because Plaintiff was a woman, and that a man was needed on the task to make the recalcitrant party deliver the work product.

**Deleted: TBD**

Law Offices of Vernon C. Goins
1970 Broadway, Suite 450, Oakland, California 94612
Tel. (510) 663-3700; Fax (510) 663-3710

113. The comments were sexist and insulting, and also failed to appreciate that Plaintiff was assigned a 12-site automotive project without any support or staff of any kind.

114. The automotive cyber security project was a first time, fifteen million dollar project with twelve (12) sites. Plaintiff was given the task of standing it up, and running it, in addition to her regular work, without any support.

115. In mid-December of 2020, Defendant hired an American from California to join the team. It was unclear how the taskings would work given the time difference. Plaintiff's team was told that the new hire was going to be a Senior Program Manager, but there was no such role on the team.

116. In March of 2021, during yet another weekly team meeting, Mr. Caffrey again bullied and harassed Plaintiff, calling her out by name, and again demanding that she engage in bantering with him about Donald Trump, and white supremacy politics.

117. Finally, in April of 2021, Mr. Caffrey was replaced because he was not getting along with another manager. Mr. Caffrey was replaced by Gabor Hornyak (hereinafter "Mr. Hornyak"), a white male Hungarian national.

118. During Mr. Hornyak's first conference call with the team (approximately 100 people), Mr. Boggie singled out and berated Plaintiff for not posting the status of her project to the entire company on the Yammer platform, which she was not required to do, and which other employees also did not do when a project was ongoing.

119. It was obvious that Mr. Boggie manufactured a reason to make Plaintiff look bad to the new manager.

120. In May of 2021, Plaintiff was asked to participate in a follow-up meeting of an employee 360 degree survey that was conducted about the management team.

121. However, Plaintiff had not participated in the survey because she feared retaliation, and participation was not required. During the debriefing meetings, however, Plaintiff was interrogated about her opinions regarding management even though she had not filled out the form.

122. They repeatedly demanded that Plaintiff attend meetings for a survey she had not completed added to her workload, and her stress.

**Deleted:** TBD

Law Offices of Vernon C. Goins
1970 Broadway, Suite 450, Oakland, California 94612
Tel. (510) 663-3700, Fax (510) 663-3710

123.    Additionally, at that time Defendant pressured Plaintiff to take on more work by spending time with a newly hired female colleague who was on Pacific Standard Time, helping to bring the new hire up to speed.

124.    At the time, Plaintiff was overwhelmed with the work she was already assigned, and was not in a position to continue to change her hours to accommodate the extremely late hours involved with assisting the new hire.

125.    Plaintiff then learned that the new employee had not been assigned any tasks other than the optional employee survey workshop.

126.    At her wit's end, Plaintiff reached out the Workers' Council in Germany, and to Defendant's HR team in early May 2021, to complain about the pressure to take on work outside of the scope of her duties, and the harassment she was feeling on the job.

127.    Plaintiff also informed Defendant's HR team that the huge volume of work she was assigned was exacerbating health challenges she was enduring at the time.

128.    The Workers' Council referred Plaintiff to a third-party entity that provided advice on how to handle (i.e., ignore and move through) sexist comments, and manage a hostile work environment.  However, the counseling entity had little experience with racism in the workplace and provided advice to cope with hostility, not to change it.

129.    Three weeks later, in June of 2021, Mr. Hornyak asked Plaintiff to take on an additional  six-month effort project, but gave Plaintiff six weeks to complete it.

130.    At the time Plaintiff was already overwhelmed, simultaneously working on thirteen sites.  Importantly, none of the Plaintiff's team members were asked or expected to carry the load that Plaintiff was, and none were placed under the same kind of pressure.

131.    Plaintiff was informed by the head of the Workers' Council that it was against German law for Defendant to force additional work on her that was outside of the scope of her annual planning goals.  This additional project was not included in Plaintiff's goals.

132.    In negotiating the stated goals, Mr. Hornyak tried to pressure Plaintiff on several occasions to identify her automotive project as only one goal, when in fact, because she was doing

Deleted: TBD

1    work at twelve different sites, it was twelve goals.  In so doing, Mr. Hornyak attempted to minimize

2    the work Plaintiff was doing, in order to justify giving her more work.

3        133.    When Plaintiff informed Mr. Hornyak that she simply could not take on the extra

4    work, Mr. Hornyak called a second meeting, with Mr. Caffey, so that both men could bully and

5    pressure Plaintiff to take on the project.

6        134.    When Plaintiff stood her ground, Mr. Caffey began to make veiled threats that

7    Plaintiff would lose her job if she did not agree to the take on the extraordinary volume of work.

8    Again, none of Plaintiff's colleagues were asked to take on the project, only Plaintiff was harassed

9    in this way.

10        135.    Mr. Hornyak then dangled a promotion in front of Plaintiff, stating that if she took

11    on the extra work, she would be considered for a promotion.  However, Plaintiff was promised a

12    promotion two years in a row, and she watched colleagues who had less qualifications and who

13    did substantially less work, get promoted ahead of her.

14        136.    When Plaintiff continued to refuse to accept the extra project, Mr. Hornyak

15    threatened her with consequences, stating that he needed to speak with his superiors to determine

16    what they would be.  Plaintiff, nevertheless, held her ground.

17        137.    Then Mr. Hornyak lied to his own superiors, claiming that Plaintiff had agreed to

18    take on the project, forcing Plaintiff to set the record straight and clarify that she had entered no

19    such agreement.

20        138.    Approximately two months later, Defendant hired a new person, who was

21    reportedly a friend of Mr. Boggie and Mr. Caffey, as a Senior Security manager, above Plaintiff,

22    based in Scotland, whom they identified multiple times as a former police officer.

23        139.    The new hire worked for a few weeks on and off, and then went on sick leave.  He

24    never returned from sick leave, and was never seen or heard from again.

25        140.    Defendant then hired a second person, who was again a friend of Mr. Boggie and

26    Mr. Caffey, who also went out on sick leave, and did not return before August 2022.

27

28

Law Offices of Vernon C. Goins
1970 Broadway, Suite 450, Oakland, California 94612
Tel. (510) 663-3700; Fax (510) 663-3710

Deleted: TBD

Law Offices of Vernon C. Goins
1970 Broadway, Suite 450, Oakland, California 94612
Tel. (510) 663-3700/ Fax (510) 663-3710

141.   In a team meeting that took place in September of 2021, Mr. Hornyak made a joke about the whipping of Haitian immigrants on the United States border by agents on horseback, that had been widely reported in Europe.

142.   Mr. Hornyak made a tactless and racist remark, indicated that Black Americans enjoy such abuse.  The entire meeting went silent after his inappropriate comment.  Plaintiff was mortified and furious.

143.   In October of 2021, after returning from bereavement leave from the loss of her mother-in-law, Mr. Hornyak tried to force Plaintiff to take on yet another project, knowing that Plaintiff had upcoming approved annual leave that she was planning to take to travel back to the United States.  Under German law, annual leave is sacrosanct, and Plaintiff had to use it or lose it.

144.   Then, in discussions about Plaintiff's performance appraisal, Mr. Hornyak accused Plaintiff of having completed an insufficient amount of work for the year.

145.   In fact, Plaintiff had completed twenty-four (24) audits in 2021, when the normal amount was eight (8).

146.   Again, Mr. Hornyak attempted to bully Plaintiff into taking an assignment outside of the scope of her annual plan.

147.   Because Plaintiff refused to take on the additional projects, Mr. Hornyak accused her of not being a team player.  In response, Plaintiff pointed out that she was the only one expected to take the additional projects, and that promotions that were promised to her were already given to others who did less work.

148.   At that point, Mr. Hornyak commented that Plaintiff should not complain about the disparate workload, because "some people were just supposed to work twice as hard as others", or words to that effect.

149.   Plaintiff rejected that assertion, and stated that she was not willing to work twice as hard as her colleagues. Once it became clear to Plaintiff that the call was not productive and Mr. Hornyak began to escalate the tensions, Plaintiff got off the phone.

Deleted: TBD

Law Offices of Vernon C. Goins
1970 Broadway, Suite 450, Oakland, California 94612
Tel.: (510) 663-3700; Fax: (510) 663-3710

150.    In mid-October, Plaintiff finalized the automotive project which had taken over a year, but nonetheless she received many accolades from stakeholders outside and inside the department regarding the excellent work performed on the project.

151.    On or about October 28, 2021, Plaintiff received an email invitation to meet with HR to discuss an allegation that had been filed by Mr. Boggie and Mr. Billeau, claiming that Plaintiff had stated that she was denied promotions because of her race. Importantly, at that time, Plaintiff had not made any such allegation, to anyone.

152.    When HR and the Workers' Council asked Plaintiff about the allegation, she reported what had been transpiring, including the comment from Mr. Hornyak implying that he expected Plaintiff to work twice as hard as her colleagues.

153.    HR asked Plaintiff to make a comprehensive list of the things that had transpired during her tenure. When Plaintiff submitted the list, it was so long she was asked to scale it down.

154.    After interviewing Plaintiff at length, the HR team in Austin, TX and in Eindhoven, and further raised the issue to the Head of Diversity and Inclusion, Sherry Alexander (hereinafter "Ms. Alexander"), who was resident in the United States.

155.    Within five days of the case being escalated, Plaintiff met with Ms. Alexander virtually via video conference. Ms. Alexander was new to the role of Head of Diversity, Equality & Inclusion, since the role was created after the Black Lives Matter protests took place.

156.    On information and belief, Ms. Alexander was given substantial power to intercede in personnel matters where there is substantial indicia of gender or race discrimination.

157.    Ms. Alexander stated that she was shocked with the way Plaintiff was being treated. Ms. Alexander claimed that she would reach out to Lars Reger (hereinafter "Mr. Reger"), who was located in Hamburg, but who reported directly to the CEO.

158.    While Ms. Alexander agreed to intercede in speaking to Mr. Reger, she did not take any other proactive steps, such as interviewing the persons Plaintiff accused, ordering sensitivity training for the group, or launching a disciplinary investigation into Plaintiff's claims.

159.    While Ms. Alexander was ostensibly escalating the issue to Mr. Reger, Mr. Hornyak was again pressuring Plaintiff to take on the additional project that she had already declined.

160.    In order to force Plaintiff to take on the project, Mr. Hornyak engaged in slight-of-hand, taking the "Common Criteria" and automotive projects that were part of Plaintiff's duties, and reassigning them to someone else, *immediately after* Plaintiff had completed it.

161.    The purpose of this game was to justify giving Plaintiff additional work by making it look like her load was lighter than it actually was.

162.    Two weeks later, a few days before Plaintiff was to depart for her home leave, Mr. Hornyak again attempted to make her take on a new project, different than the ones she had already turned down, but equally outside of the scope of her duties.

163.    And, again, the timing was designed to interfere with Plaintiff's home leave.  Not surprisingly, Plaintiff again turned it down.

164.    Knowing that Plaintiff was going to be out of the office on leave from December 13, 2021, to January 17, 2022, after having banked and saved up her annual leave for that purpose, Mr. Hornyak selected Plaintiff for rebuke during the team meeting for "lack of productivity" during the time that she was going to be on leave.

165.    This bullying tactic was reserved for Plaintiff because Mr. Hornyak did not punish other employees for taking extended annual leave, which was normal in the company.  Indeed, it was common for employees to take the entire month of August off for annual family vacations.

166.    Plaintiff asserts that she was targeted for reprisal for taking leave because she is African American, and because Mr. Hornyak subscribed to the belief that she should have to work harder than her white colleagues because of her race.

167.    On or about November 30, 2021, Plaintiff spoke again with Ms. Alexander, who indicated that she had spoken with Mr. Reger, and that they were both in agreement that what was happening to Plaintiff was completely unacceptable, and that steps would be taken to rectify the situation Plaintiff was enduring.

**Deleted:** 13th

**Deleted:** TBD

FIRST AMENDED COMPLAINT ("FAC")
*Antoinette Dickens v. NXP Semiconductors*
USDC-NDCA Case No. 5:23-CV-01073-BLF
- 20 -

Law Offices of Vernon C. Goins
1970 Broadway, Suite 450, Oakland, California 94612
Tel. (510) 663-3700; Fax (510) 663-3710

Law Offices of Vernon C. Goins
1970 Broadway, Suite 450, Oakland, California 94612
Tel. (510) 663-3700; Fax (510) 663-3710

168.   However, Ms. Alexander's assurances amounted to nothing.  Ms. Alexander, in conjunction with other HR leaders located in the United States, failed to take any meaningful steps to protect Plaintiff, or address the harm that she was enduring.

169.   On or about December 9, 2021, HR in Germany sent Plaintiff an email update after Plaintiff's call with Ms. Alexander, stating that as a first step, Ms. Alexander and Mr. Reger would have a meeting with Mr. Hornyak, and the other managers with whom Plaintiff had worked.

170.   Prior to taking leave, Mr. Hornyak informed Plaintiff that he intended to place negative statements in her review, suggesting that she was "difficult" and "uncooperative," while failing to mention that she was carrying a heavier load than her colleagues.

171.   Plaintiff reached out immediately to the Workers' Council and HR, seeking advice, since Mr. Hornyak was planning to sabotage her performance rating because of her refusal to take on extra work, and to be treated disparately than her colleagues.

172.   They told Plaintiff that she would have time upon her return to address the issue with her chain of command, and that the appraisal would not be final until after her formal meeting with her manager.

173.   Plaintiff went on vacation, and did not hear from either Ms. Alexander or Mr. Reger, or anyone from the HR team.  Again, this was a failure of senior leaders in the United States.

174.   Plaintiff's return to Germany was complicated by the fact that she had been exposed to COVID and had to quarantine, thus having to extend her stay in Chicago for two weeks.

175.   To mitigate the impact, Plaintiff worked remotely while still in Chicago, to ensure that her deadlines were met.  From January 17, 2022, to February 5, 2022, Plaintiff worked remotely.

176.   However, Mr. Hornyak was even more hostile and aggressive towards Plaintiff during the time she was working remotely, starting to heavily micromanage Plaintiff's work in order to find a basis to discipline her.  This was in retaliation for Plaintiff's engagement with HR.

**Deleted:**

**Deleted:** TBD

FIRST AMENDED COMPLAINT ("FAC")
*Antoinette Dickens v. NXP Semiconductors*
USDC-NDCA Case No. 5:23-CV-01073-BLF
- 21 -

177. Plaintiff attempted to have a remote formal meeting with Mr. Hornyak, who at that point claimed it was too late for her to submit her input into her appraisal, and that any discussion about her appraisal needed to include his superior, Mr. Billeau.

178. Plaintiff reached back out to the Workers' Council, who made clear that Mr. Hornyak was wrong, and that he was responsible for meeting with Plaintiff to hear her formal comments and feedback.

179. Plaintiff reported to Florian Hartwich (hereinafter "Mr. Hartwich"), her contact in Germany HR, who reports to HR leadership in the United States, that Mr. Hornyak would not meet with her, at which point Mr. Hartwich told Plaintiff to report everything that was happening to her to Global HR in the United States.

180. While Plaintiff was still working remotely, Mr. Hornyak insisted on meeting with her to review her work hours, which was unheard of. On Plaintiff's team, which was scattered across many time zones, and which was made up entirely of salaried workers, people worked whatever hours were necessary to complete projects, and to collaborate with colleagues in different parts of the world. This was another example of Plaintiff being treated disparately.

181. While Plaintiff was in Chicago, she was on Central Standard Time, working in the early hours before dawn to make sure she could work with internal and external clients in an efficient manner.

182. Plaintiff felt that Mr. Hornyak was intentionally trying to antagonize her, so she reached out to Wolfgang Steinbaeur (hereinafter "Mr. Steinbaeur"), who reported directly to Mr. Reger, about the harassment and bullying from Mr. Hornyak.

183. Mr. Steinbaeur indicated that what was happening to Plaintiff was not acceptable, and that part of the problem was likely due to Mr. Hornyak's lack of experience as a manager.

184. Mr. Steinbaeur further indicated that when Plaintiff arrived back in Germany, he would facilitate a meeting to review how the distribution of work was being handled across the team.

Law Offices of Vernon C. Goins
1970 Broadway, Suite 450, Oakland, California 94612
Tel. (510) 663-3700; Fax (510) 663-3710

Deleted: .

Deleted: Steinbauer

Deleted: TBD

Law Offices of Vernon C. Goins
1970 Broadway, Suite 450, Oakland, California 94612
Tel. (510) 663-3700; Fax (510) 663-3710

185.   Mr. Steinbaeur also indicated that he wanted Plaintiff to meet with the Global HR Partner in the Netherlands, Esther Meenhuys (hereinafter "Ms. Meenhuys"), who was responsible for Mr. Reger's group.

186.   Ms. Meenhuys reported directly to Pam Brown (hereinafter "Ms. Brown"), a United States based HR Manager.  All decisions made by Ms. Meenhuys, including the performance review process, was directly supervised by Ms. Brown.

187.   Ms. Brown reported directly to Mr. Jensen, both of whom were resident in the United States.

188.   The following day, Plaintiff received another demand that she meet alone with Mr. Hornyak, which she refused.  Plaintiff insisted that if they were to meet, she wanted her representative from the Workers' Council and HR to be present, which was her prerogative.

> **Deleted:** under German law.

189.   Plaintiff insisted on having a representative because Mr. Hornyak repeatedly used one-on-one meetings to bully, browbeat and pressure Plaintiff.

190.   Plaintiff physically returned to Germany on February 5, 2022.  Plaintiff met with Mr. Steinbaeur in a video conference on or about February 8, 2022.  In that meeting, Mr. Steinbaeur indicated that he had placed Mr. Hornyak on a verbal warning for his improper behavior towards Plaintiff.  Mr. Steinbaeur stated that if Mr. Hornyak had one more incident, he would be removed.

191.   Mr. Steinbaeur demanded that Mr. Hornyak provide him with a 2022 work allocation plan, and that when Mr. Steinbaeur received it, he would share it with Plaintiff.

192.   In regard to Plaintiff's concerns about being denied promotions, Mr. Steinbaeur recommended that Plaintiff simply let it go, and move on.  He further referred Plaintiff to HR.  He did agree, however, that Mr. Hornyak's accusation that Plaintiff had not completed sufficient work was patently false.

193.   A few days later, Mr. Steinbaeur sent Plaintiff the first iteration of the work allocation schedule.  This document was completely false, and Plaintiff was able to correct it to show the work she had actually done.

194.   Plaintiff sent back the work allocations for both 2021 and 2022, with supporting evidence of what she had done, as well as what she had been assigned for the rest of 2022.

> **Deleted:** TBD

Law Offices of Vernon C. Goins
1970 Broadway, Suite 450, Oakland, California 94612
Tel. (510) 663-3700; Fax (510) 663-3710

195.   In March 2022, Mr. Hornyak was forced to revise the document he had drafted three times, and was further ordered to reduce Plaintiff's workload, because it was at 160% capacity.  A normal workload allocation was considered anywhere from 80% - 100%.

196.   On or about February 14, 2022, Plaintiff met with Ms. Meenhuys about all the issues, and showed HR that for the much of 2021 and 2022 year, Plaintiff was far above 100% capacity.  They further discussed the retaliation from Mr. Hornyak in the form of his negative performance evaluation of Plaintiff.

197.   Around the same time, Plaintiff was scheduled to travel to Romania for a site visit, but was unable to go due to quarantine rules.  Mr. Hornyak was not aware of these rules, and had planned to ambush Plaintiff at the site in Romania, without letting her know that he would be there.

198.   Mr. Hornyak did this so that he could be alone with Plaintiff after she had indicated that she did not feel comfortable in any one-on-one meetings with him.

199.   While Mr. Hornyak was in Romania, he was called into an emergency meeting with Ms. Meenhuys to discuss his treatment of Plaintiff.

200.   Two days later, Ms. Meenhuys contacted Plaintiff and indicated that Mr. Hornyak was regretful and wanted to engage in a mediation with Plaintiff to improve their working relationship and trust.

201.   Plaintiff stated that she would agree to the meeting, but insisted that the meeting cover the lies that were told to HR in October of 2021, that launched the HR investigation into Plaintiff.

202.   Thereafter, as a result of Mr. Steinbaeur's intercession, Mr. Hornyak was forced to reassign work away from Plaintiff, to be split between ***three different people***, including Mr. Caffrey and Mr. Hornyak.

203.   Plaintiff was never compensated for the volume of additional work that she completed, and she was never retroactively promoted, as was promised to her.

204.   On information and belief, the decision not to promote Plaintiff was made by HR staff in the United States, since local HR business partners do not have the authority to make such decisions.

Deleted: TBD

205.    In fact, Plaintiff was the lowest paid member of her team.  She was a GS3 in rank, and was paid less than a white male, Michael Sandu, who had no degree, no certifications and substantially less work experience than Plaintiff.

206.    On information and belief, Plaintiff's compensation was determined by Senior Global HR staff in the United States, because they set salaries for positions globally.

207.    Furthermore, Plaintiff executed the same level of work and had the same responsibilities as the persons on her team who were ranked as GS4, and were paid substantially more than she was.

208.    The people who were paid as GS 4 did not carry the same volume of work as Plaintiff.

209.    After it became clear that Plaintiff had carried an extraordinary workload for two years, she was still not promoted at the end of 2022.

210.    On information and belief, the decision to deny Plaintiff a promotion was made in part, and/or ratified by HR management in the United States.

211.    On repeated occasions, Plaintiff informed both HR and her management team that she was struggling with health issues that were being exacerbated by work stress and the immense work burden she was carrying.

212.    On or about March 2, 2022, Plaintiff met with Mr. Hornyak and Ms. Meenhuys. Although Mr. Hornyak admitted to several of the jokes and micro-aggressions, including attacking Plaintiff's intelligence level in her performance review, he did not take responsibility or seem willing to change his behavior.

213.    Mr. Hornyak wanted to return to doing one-on-one meetings with Plaintiff, but Plaintiff refused.

214.    Importantly, HR took no action to address the fact that Plaintiff was overworked for years, and also took no steps to rectify Plaintiff's performance evaluation.  Essentially, the entire purpose of the mediation was to get Plaintiff to forgive Mr. Hornyak, but not to address any of Plaintiff's concerns.

Deleted: TBD

Law Offices of Vernon C. Goins
1970 Broadway, Suite 450, Oakland, California 94612
Tel. (510) 663-3700; Fax (510) 663-3710

Law Offices of Vernon C. Goins
1970 Broadway, Suite 450, Oakland, California 94612
Tel. (510) 663-3700; Fax (510) 663-3710

215.    Ms. Meenhuys admitted that when she talked to Mr. Hornyak and then talked to Plaintiff, it was if they were living in different worlds. Plaintiff concurred and asserted that this was the reason she wanted a witness in her conversations with Mr. Hornyak. Ms. Meenhuys also agreed that Plaintiff did not need to be micromanaged after four (4) years of doing the job satisfactorily.

216.    Importantly, Mr. Hornyak was proven to be less than honest with respect to the distribution of work. To date, Plaintiff has not been accused or proven to be dishonest in any of her communications with Defendant about Mr. Hornyak or anyone else.

217.    On or about March 22, 2022, Plaintiff met with Mr. Hornyak and Ms. Meenhuys again, under the guise of getting to the bottom of what happened in October of 2021, when lies were told about Plaintiff to HR.

218.    Ms. Meenhuys stated that Plaintiff didn't need an explanation of what happened, that the men she worked with were "old school," and that as a result Ms. Meenhuys concluded that none of them had "bad intentions."

219.    Plaintiff ultimately agreed to reinstitute one-on-one meetings with Mr. Hornyak in order to keep her employment, but only if the calls were recorded. Mr. Hornyak agreed to that condition in front Ms. Meenhuys.

220.    Five (5) minutes after ending the meeting with Ms. Meenhuys, Mr. Hornyak attempted to micromanage Plaintiff again, and Plaintiff pointed out that she would not be able to complete her tasks on time if she needed to check in with him about every minute detail.

221.    Understanding that nothing was going to change from Ms. Meenhuys' intercession, on or about April 15, 2022, Plaintiff reached back out to Ms. Alexander in the United States, who stated that Plaintiff should file an ethics violation about the continued behavior of the management team, but who took no action herself to help Plaintiff in any way.

222.    At that point, some of the issues Plaintiff had been addressed in the mediation. The workload issue had been addressed going forward, but no remedy was provided to Plaintiff for not being properly compensated for the work she had done. The racist and bullying behavior of Plaintiff's managers was considered "closed," with Ms. Meenhuys' conclusion that there were "no

Deleted: TBD

Law Offices of Vernon C. Goins
1970 Broadway, Suite 450, Oakland, California 94612
Tel. (510) 663-3700; Fax (510) 663-3710

1  bad intentions." And Plaintiff's claim that she was denied promotion was addressed with

2  Defendant's conclusion that Plaintiff should just ignore the discrimination and move on.

3      223.   The final item to be settled was Plaintiff's demand to have the negative comments

4  in her performance appraisal removed.

5      224.   In a recorded one-on-one conversation with Mr. Hornyak, Mr. Hornyak stated that

6  he would be willing to work with HR to see if he could erase or amend the comments. However,

7  there was no follow-through on this representation.

8      225.   Plaintiff also followed up with HR in the United States to have the 2021 work

9  allocation file attached to the performance appraisal. After a lot of run around, the request was

10 ultimately denied stating it was too late.

11     226.   In the meantime, Plaintiff reached back out to Ms. Alexander because the racist

12 behavior of her managers had not changed. Despite Plaintiff providing proof to Ms. Alexander

13 that Mr. Boggie and other managers were mocking the Diversity, Equity and Inclusion program,

14 and were openly hostile to the hiring, retention and promotion of people of color, Ms. Alexander

15 again took no action.

16     227.   Plaintiff tried to get Mr. Hornyak to commit to a meeting with HR and the Worker's

17 Council to discuss removal of the comments, but Mr. Hornyak actively avoided the meeting for

18 weeks.

19     228.   On April 22, 2022, Mr. Hornyak indicated that Mr. Boggie was going to step in and

20 take over the process, which was improper.

21     229.   Plaintiff contacted Mr. Hartwich in HR and the Worker's Council to inquire about

22 the absence of her direct manager in this process.

23     230.   On or about April 29, 2022, Plaintiff received an email from HR Germany stating

24 that they were going to follow up with Mr. Hornyak and Mr. Boggie about his refusal to attend the

25 meeting that was set up.

26     231.   In the same communication, Plaintiff was informed that Ms. Meenhuys would take

27 over the HR responsibility to attempt to reach resolution. However, there was never any reply from

28 Ms. Meenhuys following this announcement.

**Deleted:** TBD

Law Offices of Vernon C. Goins
1970 Broadway, Suite 950, Oakland, California 94612
Tel. (510) 663-3700; Fax (510) 663-3710

232. In June of 2022, Plaintiff emailed Ms. Meenhuys stating she was concerned there was no reply at all from HR regarding the retaliatory comments in her performance appraisal.

233. A few days before Plaintiff was scheduled to traveled to the Netherlands for a site visit, Mr. Hornyak started hounding Plaintiff for details about her travel itinerary for a four(4) day trip, which had never happened before, and was not something that was done in the office.

234. Since Mr. Hornyak approved the travel request and Plaintiff did not book her own travel, all Mr. Hornyak needed to do to get her travel schedule was to ask the team assistant for a copy of Plaintiff's itinerary.

235. On or about May 4, 2022, Mr. Hornyak flew to the Netherlands to again confront Plaintiff, and have the kind of unrecorded one-on-one conversation that he had previously agreed not to do.

236. Mr. Hornyak waited until the end of the day to corner Plaintiff to demand that she discuss her work travel plans in detail with him. His demeaner was hostile and aggressive, and immediately put Plaintiff in fear for her safety, since his presence was so out of the norm, and his demeanor was so antagonistic.

237. Plaintiff again referred Mr. Hornyak to the admin to get a copy of her itinerary, and she left the room, not wishing to be alone with Mr. Hornyak for any reason.

238. That evening, Plaintiff emailed Mr. Steinbaeur to report what was happening, and asked if, despite the agreement about recording all conversations between them, Mr. Steinbaeur was aware of what Mr. Hornyak was doing.

239. Mr. Steinbaeur stated that he did not know Mr. Hornyak's whereabouts, nor what Mr. Hornyak was doing at the site, but tried to play down the seriousness of the violation of the communications agreement.

240. The following day, Plaintiff was excluded from an important team meeting in the Netherlands, and decided that it was best for her to leave the site.

241. She later called Mr. Steinbaeur to discuss what had happened. They spoke at length, during which time Mr. Steinbaeur attempted to reframe the issues Plaintiff was having with Mr. Hornyak as simply personality conflict, rather than discrimination.

Deleted: TBD

Law Offices of Vernon C. Goins
1970 Broadway, Suite #50, Oakland, California 94612
Tel. (510) 663-3700; Fax (510) 663-3710

242.   When Plaintiff brought up the other issues, such as being overworked, treated differently than her colleagues, being denied promotion, and being maligned in her performance appraisal, Mr. Steinbaeur had no response, other than to suggest that Plaintiff may be able to move out of the group or find another role during a potential reorganization. Essentially, Mr. Steinbaeur with the concurrence of U.S. based HR and Ms. Alexander, put in motion an involuntary transfer of Plaintiff out of her position.

243.   Mr. Steinbaeur stated that he would speak to the Chief Information Officer, Olli Hyypa (hereinafter "Mr. Hyypa"), a friend of his, about a new position for Plaintiff and suggested that they reconnect at a later time. He further asked Plaintiff to send him her CV for consideration of other possible roles outside of his department.

244.   Plaintiff sent Mr. Steinbaeur her CV, and a few days later, she saw that a very senior person in the company had reviewed her profile on LinkedIn.

245.   Plaintiff was then informed by Mr. Steinbaeur that the NXP Chief Information Security Officer (CISO), Suvabrata Sinha, would be contacting Plaintiff.

246.   Only a few weeks after this conversation, Plaintiff's health challenges took a turn for the worse, and she was placed on medical leave.   Plaintiff was placed on leave for approximately a month, and upon her return to work, her medical provider recommended working from home.

247.   On May 23, 2022, Plaintiff informed Mr. Hornyak that she was ill and unable to work.

248.   On the same day, Mr. Hornyak sent an erratic email to Plaintiff in an attempt to pressure Plaintiff to meet one on one to discuss what she reported to Mr. Steinbaeur in Eindhoven three weeks earlier.  Plaintiff ignored this request since she was ill and on medical leave.

249.   On or about June 15, 2022, Mr. Steinbaeur requested to know when Plaintiff would return to work so that the CISO could contact her.

250.   Plaintiff returned to work on June 20, 2022.  In the normal Monday team meeting, Mr. Hornyak put up an organizational chart that showed Plaintiff as part of another group.  In no way was Plaintiff informed of this move prior to that meeting.

**Deleted:** Steinbauer

**Deleted:** TBD

251. Plaintiff reached out to HR about what was happening and learned that the move was effective as of August 1, 2022. At the time, HR insisted that the change would not affect Plaintiff's title or her pay, and that she would have similar duties.

252. On or around the first day of her return, Plaintiff reached out to Mr. Steinbaeur by email to inform him that she had returned to work, but needed to work remotely, and further that she would need to go back out on leave at some point to have major surgery.

253. On or about June 21, 2022, Plaintiff met with Mr. Sinha for approximately 15 minutes, in which Mr. Sinha seemed interested in what Plaintiff could do. He indicated that they should meet again because he had not received her CV. Plaintiff directly emailed a copy of her CV to Mr. Sinha.

254. A second meeting with Mr. Sinha was scheduled on July 1, 2022, but he was a no show. Plaintiff sent Mr. Sinha an email to reschedule, but Mr. Sinha never responded in any way.

255. For the two months that followed, Plaintiff worked diligently to prepare her dossier of work to be transferred to Mr. Hornyak. On August 1, 2022, the change was made effective, however, Plaintiff was not provided any explanation as to what her new duties would be.

256. On or about August 3, 2022, Mr. Steinbaeur finally responded to Plaintiff's email from June 21, 2022, and contacted Plaintiff.

257. In that conversation, Plaintiff inquired about her new role and duties. Mr. Steinbaeur expressed that the change was meant to be permanent, but that he didn't have details as to what Plaintiff was supposed to be doing.

258. Plaintiff also informed Mr. Steinbaeur of the no-show from Mr. Sinha. Mr. Steinbaeur made no attempt to follow-up or facilitate the meeting and stated he didn't know why Plaintiff wasn't receiving a response.

259. As a result of the reorganization, one of Plaintiff's lateral colleagues and team members in the Netherlands, Peter Van Disseldorp (hereinafter "Mr. Van Disseldorp"), was promoted, and Plaintiff was slated to report to him.

Law Offices of Vernon C. Goins
1970 Broadway, Suite 450, Oakland, California 94612
Tel. (510) 663-3700; Fax (510) 663-3710

**Deleted:** TBD

Law Offices of Vernon C. Goins
1970 Broadway, Suite 450, Oakland, California 94612
Tel. (510) 663-3700; Fax (510) 663-3710

260.   Ultimately, as a result of the reorganization Plaintiff was functionally demoted, her management responsibilities were taken from her, and her duties were dramatically altered to only documentation review.

261.   Rather than being a security manager with more than a dozen sites that she was responsible for, Plaintiff was reduced to document review and administrative tasks.

262.   On or about November 25, 2022, Plaintiff met with Mr. Van Disseldorp in person, at which time Plaintiff discussed when she would be going out for her surgery, and finalizing the performance appraisal for the year. Mr. Van Disseldorp declined to inform Plaintiff of what her performance appraisal was going to be.

263.   During that conversation Mr. Van Disseldorp immediately pressured Plaintiff to return earlier than the recommended recovery time. Mr. Van Disseldorp threatened Plaintiff that he was going to ask for a replacement for Plaintiff because she would be going out on medical leave for more than four (4) weeks.

264.   Plaintiff went on medical leave on December 1, 2022, but her surgery was rescheduled because of a major wave of respiratory illness in Germany that overwhelmed all the hospitals. She ultimately had the surgery on January 5, 2023.

265.   In March of 2023, Plaintiff attempted to return to work, Defendant tried to obstruct and delay her return to work, prohibiting her from developing a reintegration plan to manage her return to work.

266.   On or about March 9, 2023, Plaintiff filed the instant lawsuit.

267.   Defendant demanded that Plaintiff see an NXP physician to approve the reintegration plan, and then failed to make the physician available for almost a month

268.   This forced Plaintiff to have to go back to her physician to develop another plan to return to work.

269.   In April of 2023, Defendant violated its own policies by pressuring Plaintiff to return to full duty in abrogation of the reintegration plan that had been approved by its physician.

**Deleted:** <#>Plaintiff is still recovering from the surgery and is still employed by Defendant. ¶

**Deleted:** TBD

Law Offices of Vernon C. Goins
1970 Broadway, Suite 450, Oakland, California 94612
Tel. (510) 663-3700; Fax (510) 663-3710

270.   At the end of April of 2023, Plaintiff was given her performance evaluation for the period prior to her sick leave, in which she was again denied promotion, and told that she needed to make her work move visible.

271.   However, at this time, Plaintiff was only being given menial administrative tasks, and despite having positive reviews of her work, was being denied any meaningful work to do.

272.   Plaintiff, complying, with Defendant's policies, filed an updated reintegration plan at the end of May of 2023.

273.   For the entire time that Plaintiff was involuntarily removed from the Cyber Security team, Plaintiff has been denied meaningful work to do.

274.   Seeing that she was not going to be given any meaningful work, Plaintiff tendered her resignation on or about May 31, 2023.

## CLAIMS

### COUNT I,

**Violation of Title VII,**

*(Hostile Work Environment Based on Race)*

275.   Plaintiff incorporates and references all the allegations in the previous paragraphs as if fully restated herein.

276.   Plaintiff asserts that from she has been subjected to a humiliating, bullying and severely hostile work environment, in which she was repeatedly singled out for harassment, and goaded into discussion of non-work related racially offensive subject matter.

277.   As indicated above, Plaintiff's managers went out of their way to inform Plaintiff of their support for the racist and sexist policies of Donald Trump.

278.   Inasmuch as nothing related to Plaintiff's work duties involved American politics or the policies of Donald Trump, the insistence of Plaintiff's managers to bring the subject up at every team meeting, and to demand that Plaintiff engage with them about the topic constituted repeated hostile and bullying behavior.

| Deleted: COUNTS |
| Deleted: & II |
| Deleted:  & 42 U.S.C. § 1981 |

| Deleted: TBD |

279.     As the only African American in the entire work location, Plaintiff was made to feel ridiculed, targeted, bullied and humiliated by the actions of her managers.

280.     Despite Plaintiff's efforts to divert the conversation, and finally to inform her managers that their behavior was making her uncomfortable, they persisted in the bullying and inappropriate behavior.

281.     In addition to the constant denigration and bullying of her managers, Plaintiff was the victim of a campaign to harass her from Mr. Wagner because she allegedly upset a white woman.

282.     As indicated above, Mr. Wagner acted without a factual basis for his belief, and refused to even entertain evidence from eye-witnesses who could establish that Plaintiff had done nothing wrong.

283.     Mr. Wagner was clearly biased against Plaintiff because of her race, accused her of being "intimidating," because of her race, and set out on a mission to harm Plaintiff by continuing to harass her.

284.     Mr. Wagner then took adverse action against Plaintiff by placing negative statements about Plaintiff in her performance review, which had a direct impact on her pay and ability to promote.

285.     Mr. Wagner's actions were part and parcel of a hostile work environment in which Plaintiff was singled out for bullying and harassment, was treated in a dismissive, denigrating and disrespectful manner, was subjected to racist and offensive stereotypes, and was regularly humiliated in front of her colleagues.

286.     During the time that Plaintiff was being subjected to a hostile work environment, she was suffering from health issues that became compounded by the severe stress and mental pain caused by the hostile work environment she endured.

287.     Defendant's actions were knowing and intentional, so consistent and pervasive that they actually incumbered Plaintiff's ability to execute her duties, and were motivated by racial animus against Plaintiff.

**Law Offices of Vernon C. Goins**
1970 Broadway, Suite 450, Oakland, California 94612
Tel. (510) 663-3700; Fax (510) 663-3710

Deleted: TBD

Law Offices of Vernon C. Goins
1970 Broadway, Suite 550, Oakland, California 94612
Tel. (510) 663-3700; Fax (510) 663-3710

288.   As a direct and proximate cause of Defendant's creation and maintenance of a racist work environment, Plaintiff suffered damages for which she seeks compensation of not less than $300,000.00.

**Deleted:** Plaintiff is entitled to such a remedy for both her Title VII claim, and her Section 1981 claim.

### COUNT II

**Deleted:** COUNTS III & IV

### Violation of Title VII

**Deleted:** & 42 U.S.C. § 1981

*(Disparate Treatment Based on Race)*

289.   Plaintiff incorporates and references all the allegations in the previous paragraphs as if fully restated herein.

290.   As indicated above, Plaintiff was forced to work substantially harder than her non-Black colleagues while employed by Defendant.

291.   While Plaintiff had agreed to take on a project that almost doubled her workload, Defendant was not satisfied with her extra efforts, and certainly did not compensate her commensurate with the work she was doing.

292.   Rather, Plaintiff was subjected to a constant and relentless campaign by her manager, Mr. Hornyak, to take on even more work than she was already doing.

293.   Although Plaintiff colleagues were doing less work than she was, and had both the skills and bandwidth to take on extra projects, Mr. Hornyak insisted on pressuring Plaintiff to take on the extra work.

294.   When Plaintiff refused to take on more work than she could reasonably handle, Mr. Hornyak started to threaten her with termination.

295.   In order to misrepresent the amount of work Plaintiff had done, Mr. Hornyak transitioned projects to Plaintiff's colleagues after she had completed them.  This was done to mislead senior management about Plaintiff's actual workload.

296.   When Plaintiff was finally able to get the attention of Mr. Steinbaeur on the issue, it was discovered that Plaintiff was working at more than 150% of capacity, and that she was doing work that should have been done by Mr. Hornyak.

297.   No other workers on Plaintiff's team were required to carry the work load that Plaintiff was.

**Deleted:** TBD

298.   When Plaintiff confronted Mr. Hornyak about the disparate treatment, he commented that certain people should have to work harder than others, or words to that effect.

299.   Plaintiff asserts that Mr. Hornyak's comments reveal an unfair, unrealistic and racially tinged expectation that as a Black person, she should be pleased to have to work harder than her colleagues.

300.   Although Plaintiff carried a massive workload, Defendant allowed her to receive unfair performance reviews based on things that were not related to her actual work, and on racist biases against her.

301.   During the time that Plaintiff was being subjected to a disparate treatment, she was suffering from health issues that became compounded by the severe stress and mental pain caused by the hostile work environment she endured.

302.   Defendant's actions were knowing and intentional, were so consistent and pervasive that they incumbered Plaintiff's ability to execute her duties, and were motivated by racial animus against Plaintiff.

303.   As a direct and proximate cause of Defendant's disparate treatment, Plaintiff suffered damages for which she seeks compensation of not less than $300,000.00.

## COUNT III

### Violation of Title VII

(*Denial of Promotion Based on Race*)

304.   Plaintiff incorporates and references all the allegations in the previous paragraphs as if fully restated herein.

305.   Plaintiff asserts that on two separate occasions, she was promised a promotion if she took on the extra work she agreed to, and that she was denied the promotion she was promised.

306.   Promotions that were promised to her were given to white colleagues instead.

307.   Given both her workload, and the quality of her work, Plaintiff should have been promoted.

Law Offices of Vernon C. Goins
1970 Broadway, Suite 950, Oakland, California 94612
Tel. (510) 663-3700/ Fax (510) 663-3710

308. Plaintiff was denied promotion because of her race, and because of racial animus towards her from a management team that valued her only for her productivity, but had no intention of treating her as a valuable member of her team.

309. Plaintiff was materially harmed by the denial of promotional opportunities due to her race.

310. Defendant's actions were knowing and intentional, were so consistent and pervasive that they incumbered Plaintiff's ability to make and enforce her employment contract, and were motivated by racial animus against Plaintiff.

311. As a direct and proximate cause of the unlawful and racially biased denial of promotion, Plaintiff is entitled to back pay and front pay, as well as all other financial awards that would make her whole, the amount of which can be calculated after proper discovery.

**COUNT VI**

**Violation of Title VII**

*(Disparate Pay Based on Race)*

312. Plaintiff incorporates and references all the allegations in the previous paragraphs as if fully restated herein.

313. Plaintiff asserts that during her tenure, she was paid less than her white colleagues. Specifically, she asserts that she was the lowest paid member of her team. She was a GS3 in rank, and was paid less than a white male, Michael Sandu, who had no degree, no certifications and substantially less work experience than Plaintiff.

314. Furthermore, Plaintiff executed the same level of work and had the same responsibilities as the persons on her team who were ranked as GS4, and were paid substantially more than she was.

315. The people who were paid as GS 4 did not carry the same volume of work as Plaintiff.

Law Offices of Vernon C. Goins
1970 Broadway, Suite 450, Oakland, California 94612
Tel. (510) 663-3700; Fax (510) 663-3710

Deleted: Plaintiff is entitled to such a remedy for both her Title VII claim, and her Section 1981 claim.

Deleted: VII & VIII

Deleted: & 42 U.S.C. § 1981

Deleted: TBD

316.   Defendant's actions were knowing and intentional, were so consistent and pervasive that they incumbered Plaintiff's ability to make and enforce her employment contract, and were motivated by racial animus against Plaintiff.

317.   As a direct and proximate cause of the unlawful and racially based disparate pay practices, Plaintiff is entitled to back pay and front pay, as well as all other financial awards that would make her whole, the amount of which can be calculated after proper discovery.

**COUNT V**

**Violation of Title VII**

*(Retaliation Based on Race)*

318.   Plaintiff incorporates and references all the allegations in the previous paragraphs as if fully restated herein.

319.   Plaintiff engaged in protected activity when she complained about her treatment by Defendant, and when she provided a detailed summary of the disparate treatment and hostile work environment she was being subjected to in an internal investigation.

320.   As a direct result of Plaintiff's protected activity, Defendant retaliated against her by involuntarily transferring her from her team, effectively demoting her, and removing any meaningful work from her.

321.   Rather than finding a place for Plaintiff at NXP that uses her skills, Plaintiff has been given a role of document review, which stymies her ability to grow and succeed at NXP.

322.   Defendant's refusal to promote Plaintiff, its involuntary transfer of her, its effective demotion, and denial of meaningful work for Plaintiff constitute adverse employment actions as defined in applicable law.

323.   Defendant's retaliatory actions were knowing and intentional, were so consistent and pervasive that they incumbered Plaintiff's ability to make and enforce her employment contract, and were motivated by racial animus against Plaintiff.

324.   Since her return to work for an extended medical leave, Plaintiff has been given no meaningful work to do.

Law Offices of Vernon C. Goins
1970 Broadway, Suite 450, Oakland, California 94612
Tel. (510) 663-3700; Fax (510) 663-3710

Deleted: Plaintiff is entitled to such a remedy for both her Title VII claim, and her Section 1981 claim.

Formatted: List Paragraph

Deleted: COUNTS IX & X

Deleted: & 42 U.S.C. § 1981

Deleted: TBD

Law Offices of Vernon C. Goins
1970 Broadway, Suite 450, Oakland, California 94612
Tel. (510) 663-3700; Fax (510) 663-3710

325.   Plaintiff has thus resigned from her employment.

326.   As a direct and proximate cause of Defendant's retaliatory actions, Plaintiff suffered damages for which she seeks compensation of not less than $300,000.00.

**COUNT VI**

**Violation of Title VII**

*(Hostile Work Environment Based on Sex)*

327.   Plaintiff incorporates and references all the allegations in the previous paragraphs as if fully restated herein.

328.   Plaintiff asserts that from she has been subjected to a humiliating, bullying and severely hostile work environment, in which she was repeatedly singled out for harassment, and goaded into discussion of non-work related racially offensive subject matter.

329.   As indicated above, Plaintiff's managers went out of their way to inform Plaintiff of their support for the sexist and anti-woman policies of Donald Trump.

330.   Inasmuch as nothing related to Plaintiff's work duties involved American politics or the policies of Donald Trump, the insistence of Plaintiff's managers to bring the subject up at every team meeting, and to demand that Plaintiff engage with them about the topic constituted repeated hostile and bullying behavior.

331.   As the only Black woman on her team, Plaintiff was made to feel ridiculed, targeted, bullied and humiliated by the actions of her managers.

332.   Despite Plaintiff's efforts to divert the conversation, and finally to inform her managers that their behavior was making her uncomfortable, they persisted in the bullying and inappropriate behavior.

333.   Plaintiff was singled out for bullying and harassment, was treated in a dismissive, denigrating and disrespectful manner, was subjected to sexist and offensive stereotypes, and was regularly humiliated in front of her colleagues.

334.   During the time that Plaintiff was being subjected to a hostile work environment, she was suffering from health issues that became compounded by the severe stress and mental pain caused by the hostile work environment she endured.

**Deleted:** Plaintiff is entitled to such a remedy for both her Title VII claim, and her Section 1981 claim.

**Deleted:** ¶

**Deleted:** XI

**Deleted:** TBD

335.    Defendant's actions were knowing and intentional, so consistent and pervasive that they actually incumbered Plaintiff's ability to execute her duties, and were motivated by sexist animus against Plaintiff.

336.    As a direct and proximate cause of Defendant's creation and maintenance of a sexist work environment, Plaintiff suffered damages for which she seeks compensation of not less than $300,000.00.  Plaintiff is entitled to such a remedy for both her Title VII claim, and her Section 1981 claim.

## COUNT VII

### Violation of Title VII

(*Disparate Treatment Based on Sex*)

337.    Plaintiff incorporates and references all the allegations in the previous paragraphs as if fully restated herein.

338.    As indicated above, Plaintiff was forced to work substantially harder than her male colleagues while employed by Defendant.

339.    While Plaintiff had agreed to take on a project that almost doubled her workload, Defendant was not satisfied with her extra efforts, and certainly did not compensate her commensurate with the work she was doing.

340.    Rather, Plaintiff was subjected to a constant and relentless campaign by her manager, Mr. Hornyak, to take on even more work than she was already doing.

341.    Although Plaintiff's male colleagues were doing less work than she was, and had both the skills and bandwidth to take on extra projects, Mr. Hornyak insisted on pressuring Plaintiff to take on the extra work.

342.    When Plaintiff refused to take on more work than she could reasonably handle, Mr. Hornyak started to threaten her with termination.

343.    In order to misrepresent the amount of work Plaintiff had done, Mr. Hornyak transitioned projects to Plaintiff's colleagues after she had completed them.  This was done to mislead senior management about Plaintiff's actual workload.

Deleted: XII

Deleted: TBD

Law Offices of Vernon C. Goins
1970 Broadway, Suite 450, Oakland, California 94612
Tel. (510) 663-3700, Fax (510) 663-3710

Law Offices of Vernon C. Goins
1970 Broadway, Suite 450, Oakland, California 94612
Tel. (510) 663-3700; Fax (510) 663-3710

344.   When Plaintiff was finally able to get the attention of Mr. Steinbaeur on the issue, it was discovered that Plaintiff was working at more than 150% of capacity, and that she was doing work that should have been done by Mr. Hornyak.

345.   The men on Plaintiff's team were not required to carry the work load that Plaintiff was.

346.   When Plaintiff confronted Mr. Hornyak about the disparate treatment, he commented that certain people should have to work harder than others, or words to that effect.

347.   Plaintiff asserts that Mr. Hornyak's comments reveal an unfair, unrealistic and sexist expectation that a woman should be pleased to have to work harder than her colleagues.

348.   Although Plaintiff carried a massive work load, Defendant allowed her to receive unfair performance reviews based on things that were not related to her actual work, and on racist biases against her.

349.   During the time that Plaintiff was being subjected to a disparate treatment, she was suffering from health issues that became compounded by the severe stress and mental pain caused by the hostile work environment she endured.

350.   Defendant's actions were knowing and intentional, were so consistent and pervasive that they incumbered Plaintiff's ability to make and enforce her employment contract, and were motivated by gender animus against Plaintiff.

351.   As a direct and proximate cause of Defendant's disparate treatment, Plaintiff suffered damages for which she seeks compensation of not less than $300,000.00.

<strong>COUNT VIII</strong>

<strong>Violation of Title VII</strong>

<em>(Failure to Promote Based on Sex)</em>

352.   Plaintiff incorporates and references all the allegations in the previous paragraphs as if fully restated herein.

353.   Plaintiff asserts that on two separate occasions, she was promised a promotion if she took on the extra work she agreed to, and that she was denied the promotion she was promised.

354.   Promotions that were promised to her were given to male colleagues instead.

Deleted: ¶

Deleted: XIII

Deleted: TBD

Law Offices of Vernon C. Goins
1970 Broadway, Suite 450, Oakland, California 94612
Tel. (510) 663-3700; Fax (510) 663-3710

355.   Given both her workload, and the quality of her work, Plaintiff should have been promoted.

356.   Plaintiff was denied promotions because of her gender, and because of gender based animus towards her from a management team that valued her only for her productivity, but had no intention of treating her as a valuable member of her team.

357.   Plaintiff was materially harmed by the denial of promotional opportunities due to her gender.

358.   As a direct and proximate cause of the unlawful and racially biased denial of promotion, Plaintiff is entitled to back pay and front pay, as well as all other financial awards that would make her whole, the amount of which can be calculated after proper discovery.

**COUNT IX**

**Violation of Title VII**

*(Disparate Pay Based on Sex)*

Deleted: XIV

359.   Plaintiff incorporates and references all the allegations in the previous paragraphs as if fully restated herein.

360.   Plaintiff asserts that during her tenure, she was paid less than her male colleagues. Specifically, she asserts that she was the lowest paid member of her team.  She was a GS3 in rank, and was paid less than a male, Michael Sandu, also a GS3, who had no degree, no certifications and substantially less work experience than Plaintiff.

361.   Furthermore, Plaintiff executed the same level of work and had the same responsibilities as the men on her team who were ranked as GS4, and were paid substantially more than she was.

362.   The men who were paid as GS 4 did not carry the same volume of work as Plaintiff.

363.   As a direct and proximate cause of the unlawful and racially based disparate pay practices, Plaintiff is entitled to back pay and front pay, as well as all other financial awards that would make her whole, the amount of which can be calculated after proper discovery.

Deleted: TBD

**COUNT X**

**Violation of Title VII**

*(Retaliation Based on Sex)*

364.    Plaintiff incorporates and references all the allegations in the previous paragraphs as if fully restated herein.

365.    Plaintiff engaged in protected activity when she complained about her treatment by Defendant, and when she provided a detailed summary of the disparate treatment and hostile work environment she was being subjected to in an internal investigation.

366.    As a direct result of Plaintiff's protected activity, Defendant retaliated against her by involuntarily transferring her from her team, effectively demoting her, and removing any meaningful work from her.

367.    Rather than finding a place for Plaintiff at NXP that uses her skills, Plaintiff has been given a role of document review, which stymied her ability to grow and succeed at NXP.

368.    Defendant's refusal to promote Plaintiff, its involuntary transfer of her, its effective demotion, and denial of meaningful work for Plaintiff constitute adverse employment actions as defined in applicable law.

369.    Since her return to work for an extended medical leave, Plaintiff has been given no meaningful work to do.

370.    Plaintiff has thus been compelled to resign from her employment.

371.    As a direct and proximate cause of Defendant's retaliatory actions, Plaintiff suffered damages for which she seeks compensation of not less than $300,000.00.

////

////

**JURY DEMAND**

372.    Plaintiff demands trial by jury on all claims so triable herein.

Dated: July 12, 2023                            Respectfully Submitted,

                                LAW OFFICES OF VERNON C. GOINS

Law Offices of Vernon C. Goins
1970 Broadway, Suite 450, Oakland, California 94612
Tel. (510) 663-3700; Fax (510) 663-3710

Deleted: XV

Formatted: Font: Bold

Formatted: Font: Bold

Deleted: stymies

Deleted: March 9

Deleted: TBD

1
2
3          /s/ Vernon Goins                                    Formatted: Font: Italic
4          VERNON C. GOINS II
           WILLIAM W. CASTILLO GUARDADO
5
6
7          CENTER FOR EMPLOYMENT JUSTICE
8
9          /s/ Pamela M. Keith                                 Formatted: Underline
                                                               Formatted: Font: Italic, Underline
10         PAMELA M.  KEITH                                     Deleted: )
           (pro hac vice)                                      Deleted: application forthcoming
11
12         Attorneys for Plaintiff
           ANTOINETTE DICKENS
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
                                                               Deleted: TBD

Law Offices of Vernon C. Goins
1970 Broadway, Suite 450, Oakland, California 94612
Tel. (510) 663-3700; Fax (510) 663-3710